Jane CONRAD and Richard Grundmann, Plaintiffs-Appellants,

v.

The CITY AND COUNTY OF DENVER, Defendant-Appellee.

No. 84SA313.

Supreme Court of Colorado, En Banc.

Sept. 8, 1986.

David Hofer, Lakewood, for plaintiffs-appellants.

Stephan H. Kaplan, City Atty., Stan Sharoff, Darlene M. Ebert, Asst. City Attys., Denver, for defendant-appellee.

ROVIRA, Justice.

Once again we are called upon to determine whether the nativity scene, or creche, displayed annually on the steps of the Denver City and County Building during the

Christmas season violates the Preference Clause of the Colorado Constitution, article II, section 4.[1]

On December 10, 1981, four persons [2] who described themselves as tax-paying non-Christians filed a complaint in the Denver District Court alleging that the nativity scene erected by the defendant, the City and County of Denver (Denver), represents the birth of Jesus, a Christian religious figure, and that the display and its funding through tax revenues violate article II, section 4, of the Colorado Constitution. The complaint prayed for the following relief: (1) a declaratory judgment that the actions of the defendant violate article II, section 4, of the Colorado Constitution; (2) a preliminary injunction enjoining Denver from displaying the nativity scene on the steps of the City and County Building; (3) a permanent injunction prohibiting the display of the nativity scene on publicly owned property; and (4) a court order requiring Denver to sell the nativity scene at a public auction.

After the plaintiffs presented their evidence, the trial court took judicial notice that the Christian religion is the only religion symbolized by the nativity display. Denver then moved to dismiss, arguing that the plaintiffs failed to make a prima facie showing that the nativity scene violated article II, section 4, of the Colorado Constitution. The trial court granted the motion, and the plaintiffs appealed the ruling to this court.

On appeal, we vacated the order of dismissal and remanded for further proceedings. *Conrad v. City and County of Denver*, 656 P.2d 662 (Colo.1982) (*Conrad I*). In reversing the trial court, we applied the three-part test enunciated in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), to the evidence adduced by the plaintiffs and con-cluded that they had made a prima facie showing of a violation of the second part of the *Lemon* test:

> We conclude that the plaintiffs have established a prima facie case that a principal or primary effect of the display is to advance the Christian religion by causing a substantial number of persons to perceive Denver to be expressing a preference for that religion contrary to *Colo. Const.* Art. II, § 4. Because the plaintiffs have established a prima facie case as to one of the three applicable criteria, the judgment of the district court must be reversed.

656 P.2d at 675 (footnote omitted). We also noted that upon remand the trial court could, at its discretion, allow the plaintiffs to reopen their case to present further evidence in light of the legal principles announced in the opinion. 656 P.2d at 678.

After the trial on remand in which both parties presented evidence, the trial court issued written findings of fact, conclusions of law, and judgment in which it ruled that the Denver nativity display did not violate the Colorado Constitution, article II, section 4. We affirm.

I.

On remand, the plaintiffs attempted to show the Christian nature of the nativity display, that the purpose and effect of erecting the display are to advance Christianity, and that erecting and maintaining the nativity scene result in unconstitutional political divisiveness in the Denver community. On the other hand, Denver attempted to establish that the creche, when viewed in the context of the entire Christmas holiday display, does not constitute preferential treatment within the meaning of article II, section 4, of the Colorado Constitution. Specifically, Denver's case focused on showing that the creche is included in the

1. We accepted this case for final determination after it was certified to us by the Colorado Court of Appeals pursuant to §§ 13–4–109 and –110, 6 C.R.S. (1973).

2. The four plaintiffs were Jane Kathryn Conrad, Phillip Danielson, Richard Grundmann, and David Hofer. Subsequently, Danielson and Hofer were dismissed from the action. For more details concerning the history of the litigation, see *Conrad v. City and County of Denver*, 656 P.2d 662 (Colo.1982).

display for secular purposes and that the primary effect of the nativity display is neither to advance nor inhibit religion.

A brief summary of the testimony elicited from various witnesses for the plaintiffs at either the initial hearing in 1982 or on remand will be helpful to an understanding of the issues raised in this case.

A Muslim religious leader testified that the display of the nativity scene constituted idolatry and was therefore contrary to the dictates of the Koran. He disagreed with describing the display as a "historical depiction of a national legal holiday." Instead, he characterized the display as a graven image in violation of his own religious beliefs.

A Denver rabbi, Stephen Foster, accepted as an expert in Judaism, testified that based on his contacts with the Denver Jewish community, a "substantial number" of Jews would view the display of the nativity by Denver as an establishment of religion. He further stated that he believes that the nativity scene was placed on the steps of City Hall not as a secular object but as a religious object. He did not think that the placement of the nativity scene near Santa Claus and the other secular objects detracted from its religious character. The rabbi further stated that the effect of placing the creche in the context of a public display implies that non-Christian religions are not part of the American way of life.

Phillip Giles, a Universalist, testified that Christianity was favored by the inclusion of the nativity scene in the Denver holiday display and that Universalists do not believe that the nativity scene depicts an actual historical event.

Another expert on religion, Mary Ann Surges, stated that the cessation of activities which takes place on Christmas—the closing of courtrooms, banks, and so forth—is not religious. Nor are family reunions, good will, or selfless conduct necessarily religious. But the display of the nativity scene is religious. Surges was of the opinion that some Christians would perceive the display as a governmental "validation" of Christianity.

In attempting to show that the nativity scene causes political divisiveness in the Denver community, plaintiffs entered into evidence a collection of letters to the editor, editorials, and cartoons from local newspapers, all commenting on the nativity scene—for and against. The offer led the trial court to take judicial notice of the existence of a controversy. In so doing, the court noted that the controversy is "of such common knowledge" and "nothing of recent vintage." Plaintiffs also introduced the results of a 1980 poll conducted by a local television station concerning the nativity display and the use of tax dollars to support religious activities. Moreover, William McNichols testified that while he was mayor of Denver he had received "thousands" of letters concerning the nativity display from all levels of society. He stated the letters were both for and against the display.

Denver also offered a number of witnesses in support of its position that the nativity scene does not violate the Preference Clause. Reverend Hamilton, of the First United Methodist Church, testified that he thought the purpose of the nativity display was to recognize a historical fact, the birth of Jesus of Nazareth. He stated that the circumstances of Jesus' birth are religious beliefs as opposed to historically verifiable beliefs. He noted that it was not a historical fact that Jesus was born on December 25, nor was it historically verifiable that he was born from a virgin mother with wise men and shepherds present.

McNichols testified that he believes the nativity scene is religiously significant to many people and that it is religiously significant to him. He reaffirmed earlier testimony in which he stated that he hoped that people who saw the display would revere it. According to McNichols, the nativity scene is capable of generating a season of good will "that rarely is matched during the rest of the year." The lighting display is renowned all over the world and is a great attraction for visitors of the National Western Stock Show which takes place in January.

Transcripts of the testimony of Wilbur Latham, Salvatore Carpio, and Dr. Thomas Noel were accepted by the court pursuant to agreement of the parties.[3]

Noel testified as an expert in Denver history. He said that Denver has displayed a nativity scene at least since the early 1940's, and he opined that inclusion of the nativity in the holiday display was a long-standing Denver tradition. Noel also stated that he had seen a reference to an official Denver lighting display dated as early as 1907. Noel felt that the display helped continue Denver's reputation as a city of lights.

Carpio, Councilman for the City and County of Denver, testified that he voted for the inclusion of the nativity scene in the city budget because of tradition. He denied that it was his intent to promote Christianity.

Latham, an employee of Denver's Department of Parks and Recreation, testified that his department was responsible for the erection and maintenance of the nativity display. It was he who decided to purchase the nativity display. He denied that the decision was motivated by religious intent and that the display had any religious significance to him.

The deposition of Father Neofotistos, dean of the Denver Greek Orthodox Church, was also accepted by the court pursuant to a stipulation of the parties. He testified that he does not believe that the nativity scene, when viewed as part of the whole display, has any religious significance. Yet, according to Neofotistos, the nativity scene represents a teaching of the Christian church. He did not believe that Denver's inclusion of the nativity scene within the lighting display shows a preference for Christianity.

Bishop George Evans, accepted by the court as an expert in Catholicism, explained that, although he has seen the Denver nativity display on several occasions, it has never generated reverential feelings in him. Instead, it simply reminded him of the holiday season. He stated that his thoughts are no more reverential in viewing the nativity scene in front of the Denver City and County Building than when he views a nativity scene in a commercial setting.

Another employee of Denver's Department of Parks and Recreation, Gary Jones, testified that he has been responsible for the erection and dismantling of the holiday lighting display for about fifteen years. He estimated that on any given evening during the ten days preceding Christmas as many as ten thousand cars drive by the City and County Building to see the lights and that from five to seven hundred people walk by the display. He also stated that he never saw any visitor in a reverential manner kneeling before the nativity display or paying undue attention to it. However, another employee of the Department of Parks and Recreation, Ronald Hanson, testified that he has been involved in the erection and maintenance of the holiday lighting display for about nine years and that he saw the nativity scene and the area around it treated as a place of worship "a couple of times."

A nonpracticing Jew, Jerome Karsh, stated that seeing the nativity scene did not lead him to believe that Denver is putting its stamp of approval on Christianity or that Denver is preferring Christianity over other religions. He was of the opinion that the nativity display is a symbol of the history of Christianity and found nothing offensive about the display. However, he did

---

**3.** These three witnesses had testified earlier for Denver in federal district court in actions involving a challenge to the Denver nativity display under the Establishment Clause of the first amendment. Latham testified in Civil Action No. 79–M–1605, *see Citizens Concerned for Separation of Church and State v. City and County of Denver,* 481 F.Supp. 522 (D.Colo.1979), *appeal dismissed,* 628 F.2d 1289 (10th Cir.1980), *cert.*

*denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed. 975 (1981). Carpio and Noel testified in Civil Action No. 80–DW–1661, *see Citizens Concerned for Separation of Church and State v. City and County of Denver,* 508 F.Supp. 823, 526 F.Supp. 1310 (D.Colo.1981), *aff'd,* No. 82–1022 (10th Cir. May 14, 1984) (unpublished opinion). For a brief history of the federal court proceedings, see *Conrad I,* 656 P.2d at 665.

not believe public funds should be used for its construction.

Dr. Sue Samuelson, who has a Doctor of Philosophy degree from the University of Pennsylvania, was accepted by the trial court as an expert in folklore and folklife, especially as it pertains to Christmas and nativity scenes. She testified that the context in which a nativity scene appears can add to or detract from the religious nature of the scene. According to Samuelson, the fact that the Denver nativity scene is located right next to Santa's workshop and is in close proximity to the reindeer, Santa Claus, and a wreath that says "Merry Christmas" has a profound secular effect on the nativity scene. She was of the opinion that in this context the nativity scene was not a religious symbol.

The trial court's findings of fact are consistent with this summary of the testimony. In its conclusions of law, the trial court determined, based on the guidelines set forth in *Conrad I*, that the Denver nativity scene does not violate article II, section 4, of the Colorado Constitution.

## II.

Article II, section 4, of the Colorado Constitution provides:

> The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed; and no person shall be denied any civil or political right, privilege or capacity, on account of his opinions concerning religion; but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, excuse acts of licentiousness or justify practices inconsistent with the good order, peace or safety of the state. No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent. *Nor shall any preference be given by law to any religious denomination or mode of worship.* (emphasis supplied).

The last sentence of this provision is referred to as the Preference Clause.

In *Americans United for Separation of Church and State Fund, Inc. v. State*, 648 P.2d 1072, 1081–82 (1982), and *Conrad I*, 656 P.2d at 670–72, we derived guidance in interpreting the Preference Clause by looking at the Establishment Clause of the United States Constitution [4] and the body of federal law that has construed it. In *Conrad I*, we stated that the *Lemon* test "is well-suited to a determination of the central issues in this case, taking into account the text and purpose of Article II, Section 4, and its embodiment of the Establishment Clause." 656 P.2d at 672.[5] In *Lemon*, the Court ruled that Establishment Clause analysis requires the consideration of three factors:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."

403 U.S. at 612–13, 91 S.Ct. at 2111 (citations omitted). To pass constitutional muster, the challenged governmental conduct must satisfy all three parts of this test. *Stone v. Graham*, 449 U.S. 39, 41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980); *Con-*

---

4. The Establishment Clause provides: "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I.

5. In *Conrad I*, 656 P.2d at 671–72, we also stated that, in cases where government discriminates among religions, the Supreme Court's opinion in *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), appears to mandate the use of strict scrutiny analysis. In *Larson*, the Court stated: "[W]hen we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." 456 U.S. at 246, 102 S.Ct. at 1684. We declined, however, to apply strict scrutiny in evaluating Denver's action under Colo. Const. art. II, § 4. Rather, we stated that the *Lemon* test was specifically formulated for this purpose. In *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), decided after *Conrad I*, the Court did not apply strict scrutiny analysis but, rather, applied *Lemon*.

*rad I,* 656 P.2d at 673. Plaintiffs argue that the Denver nativity display violates each of these three parts. We disagree.

Recently, the United States Supreme Court rejected an Establishment Clause challenge arising from factual circumstances almost identical to those presented in this case. In *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Court considered whether a nativity scene erected by the City of Pawtucket, Rhode Island, violated the Establishment Clause of the United States Constitution.

The Pawtucket nativity scene is part of a larger holiday display "like those to be found in hundreds of towns or cities across the nation—often on public grounds—during the Christmas season." *Lynch,* 465 U.S. at 671, 104 S.Ct. at 1358. The Pawtucket display consists of various figures and decorations including "a Santa Claus house, reindeer pulling Santa Claus's sleigh, candy-striped poles, a Christmas tree, carolers, cut-out figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that reads 'SEASONS GREETINGS,' and the creche...." 465 U.S. at 671, 104 S.Ct. at 1358; *cf. Conrad I,* 656 P.2d at 666 (description of the Denver display). The City of Pawtucket owns all of the components of the display, and it is situated in a park owned by a nonprofit organization. *Id.*

After setting forth various well established principles governing the application of the Establishment Clause, the *Lynch* Court discussed the historical role of religion in American society. The Court noted various governmental references to our country's religious heritage, including, inter alia: presidential proclamations concerning religion; executive orders proclaiming Christmas and Thanksgiving national holidays; our statutorily prescribed national motto "In God We Trust"; the language in our pledge of allegiance to the

American flag, "one Nation under God"; publicly supported art galleries displaying artwork containing religious messages; and the permanently displayed decoration of Moses with the Ten Commandments in the Supreme Court courtroom. 465 U.S. at 675–77, 104 S.Ct. at 1360–1361. This history, said the Court, helps to explain why it "consistently has declined to take a rigid, absolutist view of the Establishment Clause." 465 U.S. at 678, 104 S.Ct. at 1361. Instead, the Court has scrutinized challenged official conduct "to determine whether, in reality, it establishes a religion or a religious faith, or tends to do so." *Id.* (citing *Walz v. Tax Comm'n,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)).

In *Conrad I,* we looked to the *Lemon* test for guidance in construing our Preference Clause. *Lynch,* decided after *Conrad I,* confirms our belief that the *Lemon* test is well-suited to an analysis of nativity scenes appearing as part of a larger holiday display.[6] Given the striking similarities between the instant facts and those of *Lynch, see Conrad I,* 656 P.2d at 666, we find the *Lynch* decision persuasive in addressing the contentions raised by the plaintiffs.

A. *Secular Purpose*

Plaintiffs first maintain that the trial court erred in concluding that they failed to show that Denver's intent in displaying the nativity scene was religious.

In considering the three *Lemon* factors, the *Lynch* Court initially noted that the focus of the inquiry must be on the creche in the context of the Christmas season. Addressing whether the Pawtucket nativity scene has a secular purpose, the Court stated that it has invalidated governmental action for lack of a secular purpose but only upon concluding that "there was no question that the statute or activity was

---

**6.** Before applying the *Lemon* test, however, the *Lynch* Court noted that it repeatedly has refused "to be confined to any single test or criterion in this sensitive area." 465 U.S. at 679, 104 S.Ct. at 1362. The Court then noted two recent examples of Establishment Clause cases in which it did not apply the *Lemon* test, *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982).

motivated wholly by religious considerations." 465 U.S. at 680, 104 S.Ct. at 1362 (citations omitted). The Court then held that the trial court erred in ruling that the creche lacked a secular purpose, stating that the trial court "plainly erred by focusing almost exclusively on the creche." 465 U.S. at 680, 104 S.Ct. at 1362. Rather than focusing on the creche alone, the Court viewed it in the context of the Christmas holiday season. The Court then concluded: "The display is sponsored by the City to celebrate the Holiday and to depict the origins of that Holiday. These are legitimate secular purposes." 465 U.S. at 681, 104 S.Ct. at 1363. Here, the trial court, as if anticipating the *Lynch* decision, also based its decision on the context in which the nativity scene appears. In its conclusions of law, the trial court stated in relevant part:

> Based upon the evidence presented, this Court concludes that the Plaintiffs have failed to show that Denver's intent in including the creche was religious.
>
> . . . .
>
> ... Given the fact that Denver's display includes many, if not most, of the traditional Christmas symbols associated with the holiday season, the Court concludes that Denver's purpose in displaying the nativity scene amidst these other holiday artifacts was secular.

Moreover, here, as in *Lynch*, there is insufficient evidence in the record "to establish that the inclusion of the creche is a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message." 465 U.S. at 680, 104 S.Ct. at 1362. To the contrary, the evidence demonstrates that the main intent or purpose of including the nativity scene in the holiday display is to promote a feeling of good will, to depict what is commonly thought to be the historical origins of a national holiday, and to contribute to Denver's reputation as a city of lights. In sum, we uphold the trial court's determination that the Denver nativity scene, when viewed in the context of the larger display, evidenced a purpose that is secular.

**B. *Primary Effect***

Plaintiffs next contend that the trial court erred in finding that Denver successfully rebutted their prima facie showing that the effect of the Denver nativity display is to advance religion. In so doing, the plaintiffs implicitly raise the second part of the *Lemon* test.

Here, the trial court reached the following conclusions concerning the primary effect of the Denver nativity display:

> Denver presented a number of witnesses who effectively testified that the presence of the nativity scene in the Christmas display evokes secular responses in them. Attitudes of reverence or devotion were uncommon experiences while feelings of the holiday season such as good will, selflessness and celebration predominated. In addition, witnesses testified that the nativity scene served to mark the historical origin of a national legal holiday and advanced Denver's reputation as a City of Lights....
>
> In reaching the conclusion that the primary effect of the display is one which neither advances nor inhibits religion, the Court views the nativity scene as an integral part of the entire Christmas display and not in isolation. *Allen v. Morton*, 495 F.2d 65, 74 (D.C.Cir.1973). When viewed in such a light, the Court concludes that if there is any effect upon religious beliefs or practices it is remote and only incidental to the city's legitimate participation in a secular Christmas celebration.

Although the "principal or primary effect" question is close, we believe that the trial court's rulings are both supported by the record and consistent with *Lynch*.

In determining whether the Pawtucket creche has a primary effect of advancing religion, the *Lynch* Court first compared the Pawtucket action to other forms of governmental support of religion in which the Court has declined to find an Establishment Clause violation. 465 U.S. at 681–82, 104 S.Ct. at 1363. *See, e.g., Walz v. Tax Comm'n*, 397 U.S. 664, 90 S.Ct. 1409, 25

L.Ed.2d 697 (1970) (tax exemptions for church properties); *Board of Educ. v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (expenditure of public money for textbooks loaned to students attending parochial schools). The Court stated that it could not discern a greater benefit to religion by including the creche in the display than by these other "benefits and endorsements previously held not violative of the Establishment Clause." 465 U.S. at 682, 104 S.Ct. at 1364. The Court then noted that other decisions "plainly contemplate that on occasion some advancement of religion will result from government action." 465 U.S. at 683, 104 S.Ct. at 1364. The Court concluded, as did the trial court in the instant case, that any benefit flowing from the display to one religion or all religions is "indirect, remote and incidental...." *Id.*

Here, we see no principled reason for deviating from the conclusions reached by the trial court. They not only find ample factual support in the record and legal support in *Lynch,* but they also follow the course charted by *Conrad I.* Accordingly, we uphold the trial court's determination that the primary effect of the Denver nativity display is not to advance religion. *See Citizens Concerned for Separation of Church and State v. City and County of Denver,* 508 F.Supp. 823, 827–29; 526 F.Supp. 1310, 1311–15 (D.Colo.1981) (same conclusion), *aff'd,* No. 82–1022 (10th Cir. May 14, 1984).

### C. *Excessive Government Entanglement*

In considering the third part of the *Lemon* inquiry, we stated in *Conrad I* that the excessive entanglement test requires inquiry into (1) whether there exists excessive administrative entanglement; and (2) whether the governmental action causes "continuing political strife over aid to religion." 656 P.2d at 675 (citations omitted). Plaintiffs, in asserting that the trial court erred in finding no evidence of excessive government entanglement with religion, rely solely on the second part of this inquiry; that is, they argue only that the creche has led to political divisiveness in the Denver community.

Political divisiveness was first identified as relevant to entanglement analysis in *Lemon.* 403 U.S. at 622–624, 91 S.Ct. at 2115–2116. However, since our decision in *Conrad I,* the United States Supreme Court has stated that, where the challenged conduct does not involve a direct subsidy to church-sponsored schools or colleges or other religious institutions, no inquiry into political divisiveness is necessary. *Lynch,* 465 U.S. at 684, 104 S.Ct. at 1364 (citing *Mueller v. Allen,* 463 U.S. 388, 403–04 n. 11, 103 S.Ct. 3062, 3071–3072 n. 11, 77 L.Ed.2d 721 (1983)). While we agree that the plaintiffs presented some evidence of political divisiveness within the Denver community related to the nativity display, the record supports the trial court's determination that the challenged action does not involve any direct subsidy to a school or religious institution. In short, we choose here to follow *Lynch* and, accordingly, reject plaintiffs' excessive government entanglement argument.

### D. *Preference Clause*

We recognize that, in addition to considering the federal law construing the Establishment Clause, the "text and purpose" of the state constitutional provision must also be considered. *Conrad I,* 656 P.2d at 671. It follows that under certain circumstances we could find a violation of the Preference Clause where, under the same or similar factual circumstances, the United States Supreme Court had declined to find a violation of the Establishment Clause. *See Conrad I,* 656 P.2d at 667 (determination of first amendment challenge not necessarily dispositive of state constitutional challenge); *Americans United,* 648 P.2d at 1078 (interests embodied in the Establishment Clause are not necessarily determinative of state constitutional claims). However, such a course of conduct should not be undertaken lightly. Here, we can see no sound reason for departing from the path cut by *Lynch.*

Accordingly, under the circumstances here and given the evidence adduced at trial,[7] we uphold the trial court's conclusion that the Denver nativity scene, considered in the context of the larger display, does not violate the Preference Clause of the Colorado Constitution.

Judgment affirmed.

LOHR and KIRSHBAUM, JJ., specially concur.

LOHR, Justice, specially concurring:

Although I have no important disagreement with much of what the majority says, I believe that this appeal can and should be resolved on a narrower basis.

In *Conrad v. City & County of Denver*, 656 P.2d 662 (Colo.1982) (*Conrad I*), we set forth the legal standards to be applied to resolve this case. We recognized, however, that analysis of a Preference Clause challenge to governmental action does not involve "an abstract legal question" but rather "is dependent in important part on factual determinations." *Conrad I*, 656 P.2d at 667. Accordingly, we remanded the case for necessary factual findings and application of the legal standards articulated in *Conrad I*. On remand the trial court made findings that are supported by the evidence, applied the law in a manner faithful to our mandate and arrived at a judgment consistent with its findings of fact and conclusions of law. For these reasons, the judgment should be affirmed.

KIRSHBAUM, Justice, specially concurring.

I concur in the majority's conclusion that the executive decision to include a nativity scene in the 1980–1981 Christmas display on the steps of the City and County Building in Denver, Colorado, did not violate article II, section 4 of the Colorado Constitution. I write separately to emphasize my view of the limited scope of this decision.

The decision is limited initially by the fact that the law of the case was established by this court in this very case just four years ago. In *Conrad v. City & County of Denver*, 656 P.2d 662 (Colo. 1982) (*Conrad I*), the court explored the problem of selecting an appropriate test by which to measure the applicability of article II, section 4 to this dispute, specifically rejected the strict scrutiny test articulated by the United States Supreme Court in *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), and adopted the tripartite test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). As the majority acknowledges in footnote 6, the United States Supreme Court has not hesitated to apply a strict scrutiny analysis in establishment clause cases involving state laws that discriminate among religions. In view of the absolute language of article II, section 4 of the Colorado Constitution, a governmental decision to expend public funds to display scenes of special religious significance to a particular religion might in other circumstances constitute discrimination among religions and, therefore, demand a strict scrutiny analysis. *See Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). However, this court having determined that the *Lemon* rationale is applicable to the circumstances of this case, the trial court properly complied with that conclusion on remand.

As the majority also recognizes, the evidence below was quite conflicting. The principle of appellate review applicable in such circumstance is a familiar one: appellate judges may not substitute their views of the evidence for findings of fact entered by a trial court if the trial court's findings are supported by the evidence introduced

---

7. In *Conrad I*, we stated that "the constitutional sufficiency of Denver's Christmas display is dependent in important part on factual determinations." 656 P.2d at 667. After remanding this case to the trial court for further proceedings, the trial court listened to some two and a half days of further testimony and then proceeded to make extensive findings of fact and conclusions

of law. Because the findings of fact are not clearly erroneous, we refuse to upset them on appeal. C.R.C.P. 52 ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").

at trial. *See, e.g., People ex rel. M.S.H.,* 656 P.2d 1294 (Colo.1983); *Brewer v. Williams,* 147 Colo. 146, 362 P.2d 1033 (1961). Because the trial court's findings of fact in this case are supported by the record, they may not be altered on appeal.

The court today affirms a trial court's application of a particular legal standard to particular findings of fact rendered on the basis of particular evidence. However, as the majority opinion recognizes, the Colorado Constitution, like the United States Constitution, is a living document, designed for application to new circumstances upon a principled and historic yet realistic basis. The concept of a political realm in which each person might enjoy maximum freedom to worship in the form deemed satisfactory to that individual, free from the inhibiting effect of governmental support for any particular religion or religious denomination, lies at the heart of the sparse phraseology of the establishment clause of the United States Constitution and the quite specific language of the non-preference clause of the Colorado Constitution. *Americans United for Separation of Church and State Fund, Inc. v. State,* 648 P.2d 1072 (Colo.1982); *Conrad I,* 656 P.2d 662. In this light, our decision in this case has only limited applicability to other expenditures of public funds that might occur in other circumstances.