**THE FREEDOM FROM RELIGION FOUNDATION, INC., a Wisconsin non-profit corporation; The Colorado Chapter of The Freedom From Religion Foundation, Inc.; Jeff Baysinger; Harold Huguley; Glenn V. Smith; and Lee Whitfield, Plaintiffs–Appellants,**

v.

**The STATE of Colorado; Roy Romer, Governor of the State of Colorado; Department of Administration, State of Colorado; and Forrest Cason, Executive Director, Department of Administration, Defendants–Appellees.**

No. 92CA0107.

Colorado Court of Appeals, Div. III.

June 17, 1993.

Rehearing Denied Aug. 19, 1993.

Certiorari Granted May 2, 1994.

Robert R. Tiernan, Denver, for plaintiffs-appellants.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Dianne E. Eret, First Asst. Atty. Gen., Denver, for defendants-appellees.

Coghill & Goodspeed, P.C., John P. Baker, Denver, for amicus curiae American Civ. Liberties Union of Colorado, Inc.

Opinion by Judge CRISWELL.

Plantiffs, two non-profit corporations and several individual citizens of Colorado, filed this action against the State of Colorado, the Governor, the State Department of Administration, and the department's executive director (collectively, the State), seeking the removal of a stone monument containing the Ten Commandments located in Lincoln Park near the state capitol in Denver and alleging that the stone's existence in its present location violates the "establishment clause" of the First Amendment and the comparable provision of the state constitution. In a previous appeal, this court, in *Freedom from Religion Foundation, Inc. v. State,* (Colo.App. No. 89CA1937, February 7, 1991) (not selected for publication), reversed a summary judgment for the State and remanded the cause for further proceedings. Upon remand, the trial court conducted a trial and again entered a judgment for the State, from which judgment plaintiffs again appeal. Because we conclude that the monument, as it is presently located and displayed, offends against the controlling constitutional provisions, we reverse the trial court's judgment and remand the cause to it for the fashioning of an appropriate equitable decree.

The evidentiary facts that were presented to the trial court are largely undisputed.

The state capitol in Denver sits on an area comprising two city blocks. It is bounded by Colfax Avenue on the north, East Fourteenth Avenue on the south, Grant Street on the east, and Lincoln Street on the west. Both the east and west sides of this area are landscaped with lawn and trees.

There are several monuments on the east side of the capitol, including a large statue of a native American and a buffalo. None of these features, however, can be seen from west of the capitol. In front of the west entrance to the capitol is a monument to the civil war dead, which includes two cannons.

Directly west of the capitol, across Lincoln Street, is a one-block square park, owned by the state, known as "Lincoln Park." This park is considered to be a part of the capitol "complex." As it is presently developed, the park is landscaped with lawn and trees.

Two diagonal pedestrian walkways traverse Lincoln Park, which meet roughly at its center, where there has recently been erected a Washington monument-type structure dedicated to the veterans of all of the nation's wars. The termini of these two walkways are at the park's four corners. Imbedded into the walkways, a short distance from each corner, is the seal of the State of Colorado (apparently denoting ownership of the park by the State) and the words, "Lincoln Park."

Several monuments, in addition to the one in the center, have been placed in Lincoln Park. In the park's southeast quadrant is a metal reproduction of the Liberty Bell. In raised letters on its side, the bell, like the original, has the phrase, "Proclaim liberty throughout the land and unto all the inhabitants thereof." Such phrase is taken from the Old Testament.

In the northwest quadrant is a large statue, some 20 feet tall, of a World War II solider. This monument is in tribute to a Hispanic medal of honor recipient and commemorates the participation in that war of Colorado citizens of Hispanic descent.

Abutting the sidewalk along Broadway, the street on Lincoln Park's west, is a small monument in the form of a metal fountain. It is dedicated to the memory of a specific individual, but the evidence at the trial did not further identify its purpose.

Also near the Broadway sidewalk, at midblock, is a metal flagpole dedicated to persons killed in the Spanish–American War.

Finally, in the northwest quadrant of Lincoln Park, adjacent to the diagonal walkway that runs in a generally northwest-southeast direction and 50 or more feet from the Hispanic veteran memorial, is the monument that is the subject of this litigation. It is located some 40 to 50 feet from the northwest corner of the park. That corner is adjacent to the intersection of Colfax Avenue and Broadway, one of the most well-known and busiest intersections in Denver. A much-used bus stop is nearby on Colfax Avenue.

The monument in question is made of stone and is three to four feet high and about two and one-half feet wide. It is sculpted in the form of two tablets, at the top of each of which is a floral design that surrounds the representation of two other tablets. Inside these latter tablets are symbols which were identified at trial as Phoenician letters, but which form no intelligible words in that language. The opinion was expressed at trial that this portion of the monument was designed to suggest that the tablets' message finds its source in antiquity.

Between the two tablets on this monument is an eye within a triangle, an "all-seeing eye," similar to that depicted on the dollar bill. While this symbol is Egyptian in origin, its exact meaning is in some dispute; it may represent the eye of God. Immediately below this symbol is an American eagle which is grasping an American flag.

The text of the monument is immediately below the American flag. It reads as follows:

### THE TEN COMMANDMENTS

I AM THE LORD THY GOD

I Thou shalt have no other gods before me.

II Thou shalt not take the name of the Lord thy God in Vain.

III Remember the Sabbath day to keep it holy.

IV Honor thy father and thy mother that thy days be long upon the land which the Lord thy God giveth thee.

V Thou shall not kill.

VI Thou shall not commit adultery.

VII Thou shalt not steal.

VIII Thou shall not bear false witness against thy neighbor.

IX Thou shall not covet thy neighbor's house.

X Thou shall not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

Below this text, there are stars of David, symbols of the Jewish religion, located in each corner. In the center are two Greek letters, Chi and Rho, one superimposed over

the other, which is a symbol for Jesus Christ developed by the early Christian church and still found in many Catholic churches.

At the very bottom of this monument there is the representation of a scroll with these words:

Presented

By Members of
FRATERNAL ORDER OF

EAGLES

OF COLORADO

This monument has been in place in this park since 1956. At that time, which was shortly after the issuance of C.B. DeMille's production of a movie entitled "The Ten Commandments," the Fraternal Order of Eagles (Eagles), which is a national fraternal and benevolent association, began distributing copies of the Ten Commandments.

The originator of the idea for the distribution of the Commandments was then a Minnesota trial judge, who had previously served as a juvenile judge. He conceived the idea of posting a copy of the Ten Commandments in each juvenile court in the country to demonstrate to the youths coming in contact with such courts that there were "recognized codes of behavior to guide and help them."

Initially, the Eagles rejected the notion of sponsoring the program because it was felt that such distribution "might seem coercive or sectarian." Eventually, however, representatives of the Jewish, Protestant, and Catholic faiths developed a version of the Ten Commandments (reflected on the monument in dispute) which was not identified with any one religious group, and on this basis, the Eagles agreed to support such a youth guidance program.

As this program was being implemented, however, it was determined, at the suggestion of C.B. DeMille, that stone monoliths would also be produced. Various of the Eagles' local organizations paid for these monuments and presented them to several local and state governments.

While it is agreed that the state accepted the monument as a gift and allowed it to be placed in its present location on state property, there is no evidence as to the procedure used to accept it. For example, the record does not contain a copy of any approving resolution of the General Assembly or of any committee of that body. There is testimony, however, that, in order to place any monument on these grounds, it is necessary to obtain the approval of a special committee of the General Assembly and to have a resolution of acceptance adopted by the General Assembly. Yet, there are no written guidelines describing either the procedure to be used to obtain such permission or the substantive criteria to be used in granting or denying approval.

Since the monument has been erected, maintenance costs have been minimal. The state has, however, been required to use its employees to remove graffiti placed on the stone by vandals and to clean it on occasion.

Shortly before this action was commenced, plaintiffs wrote to the Governor, asserted that the monument's presence offended against the First Amendment, and requested that it be removed. In his letter of reply refusing to remove it, the Governor acknowledged that the tablet "contained commandments [that] are directly opposed to the views" of plaintiffs, but asserted that "the tablet and the inscription are representative of the views of a large number of Colorado citizens."

During the course of the trial, both plaintiffs and the State presented expert witnesses. These witnesses all held advanced degrees in theology or related studies and most were ordained ministers. Their collective testimony explained some of the otherwise arcane symbolism on the monument. In addition, however, the testimony of these experts touched upon several other subjects.

First, while all agreed that the monument did not exactly reproduce the Ten Commandments as accepted by any particular sect, nevertheless, they also agreed that, by representing the Commandments with their references to a deity, the monument carried a religious message.

All of the experts also agreed that, at least to the extent that the Commandments estab-

lished ethical or moral principles (such as their injunctions against murder, theft, and perjury), they were expressions of universal standards of behavior common to all civilized societies. Further, it was agreed that these moral standards, as influenced by the Judeo–Christian tradition, have played a large role in the development of the common law and have formed a part of the moral background for the adoption of the national constitution.

Finally, the opinions of these experts diverged with respect to the interpretation that an average, non-expert, observer might place upon the message contained on the monument in light of its location on state property.

Experts for plaintiffs opined that the existence of the various references to God contained on the monument directly below the presentation of the American flag, together with the monolith's location on clearly identifiable state property, convey the impression that the government is endorsing both the moral *and* the religious precepts contained on the stone.

In contrast, several experts for the State expressed the view that the monument could be seen as an allusion to the historical significance of the Ten Commandments, thereby conveying a secular meaning. One such expert opined that, because of the scroll and reference to the Eagles, the monument could be looked upon as constituting approval by the State of Colorado of the good works done by that organization. All of the State's experts declared that the monument in its present location could not be considered sacred and would not inspire worship.

The lay plaintiffs testified that the existence of the monument on state property caused them to conclude that the state was approving both the religious and the moral precepts contained in the Ten Commandments. Because these religious precepts were inconsistent with the plaintiffs' strongly held views, they testified that the presence of the monument tended to demonstrate that their views were unacceptable to the state, and as a result, the monument's presence offended them. Other lay persons testified that they were not so offended.

In rejecting plaintiffs' claims, the trial court determined that the monument, while containing a religious message, was not erected with any intent to foster the religion of any particular sect. The court noted that it contains Egyptian, Jewish, and Christian symbols and that it also has patriotic symbols in the form of the eagle and the flag. Further, it concluded that the Commandments can have a secular meaning. Many of our laws have a foundation in the Bible, and the Commandments were one of the bases for the Constitution and the Bill of Rights.

It finally concluded, therefore, that, because the monument did not have the overall effect of fostering, preferring, or establishing any religion, its continued existence on state property would not violate the establishment clause of the First Amendment.

## I.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion...." And, this prohibition upon Congress has been made applicable to the states by virtue of the adoption of the Fourteenth Amendment. *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

■ As interpreted by the United States Supreme Court, this "establishment clause" does not just prohibit a government from preferring one religion or sect over another. Rather, it also prohibits a government from aiding or preferring *all* religions. *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). *See Lee v. Weisman,* —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Souter, J., specially concurring).

■ The traditional test for determining whether a state has undertaken action to aid or prefer religion in violation of the establishment clause was summarized more than 20 years ago in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). In that case, Chief Justice Burger authored a unanimous opinion in which it was determined, based on prior decisions of the court, that, if a government adopted legislation or otherwise became involved in an endeavor with religious connotations, such legislation

or action would be considered to be consistent with the First Amendment only if:

1. the legislation or other action has a secular purpose;

2. "its *principal* or *primary* effect [is] one that neither advances nor inhibits religion"; and

3. it does not cause an "excessive entanglement" with religion. 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (emphasis· supplied).

The first two parts of the *Lemon* test have undergone some clarification and further delineation as a result of Justice O'Connor's special concurrence in *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), which was seemingly adopted as the proper approach to such issues by a majority of the Supreme Court in *Allegheny County v. Greater Pittsburgh ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

In *Lynch,* Justice O'Connor wrote that, whether a government's actions advance or inhibit religion under the *Lemon* test depends upon whether those actions reasonably can be interpreted as governmental endorsement or disapproval of religion. And, to determine this issue, two factors must be considered.

First, a court must consider what message the government *intended* to convey.

Second, irrespective of any governmental intent, a court must consider what message the government's actions *actually* convey to a reasonable person.

Both the government's intended message and the message actually given must be a secular one. Thus, if the government's actions would actually be interpreted by a reasonable person either to endorse or to disapprove of either a particular religion or religion in general, those actions will run afoul of the First Amendment's prohibition.

Finally, in considering the extent to which resolution of these questions depend upon the factual determinations of a trial court, Justice O'Connor's concurrence said this:

But whether a government activity communicates endorsement of religion is not a question of simple historical fact. Although evidentiary submissions may help answer it, the question is, like the question whether racial or sex-based classifications communicate an invidious message, in large part a legal question to be answered on the basis of judicial interpretation of social facts.

*Lynch v. Donnelly,* 465 U.S. 668, 693–694, 104 S.Ct. 1355, 1370, 79 L.Ed.2d 604, 623.

We recognize that the continued viability of the *Lemon* test in this area has recently been questioned. *See, Lamb's Chapel v. Center Moriches Union Free School District,* —— U.S. ——, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Justice Scalia, concurring); *Lee v. Weisman, supra.* However, counsel for the State has conceded, and we agree, that, at least until there is a more definitive test expressly adopted by a majority of the Supreme Court, it is the *Lemon* test, as clarified by Justice O'Connor's opinion in *Lynch,* which contains the governing criteria for resolution under the First Amendment of the issues raised here.

 Further, the state constitution, Colo. Const. art. II, § 4, contains provisions prohibiting "preference ... to any religious denomination or mode of worship." This prohibition has been construed as being similar to the First Amendment's establishment clause. And, our supreme court has expressly adopted the *Lemon* test as the proper standard against which displays on government property should be judged under this state provision. *Conrad v. Denver,* 656 P.2d 662 (Colo.1982) (*Conrad I* ). Hence, our determination whether the state's actions here violated the First Amendment will also resolve whether those actions violate this state constitutional provision.

## II.

 Since the adoption of the *Lemon* test by the Supreme Court, both that court and the lower federal courts have been called upon to consider the propriety of a government's display of various religious symbols on public property in numerous contexts. These courts have considered whether either the temporary or permanent display of such items as the nativity scene (depicting the

birth of Jesus Christ), the cross (the universal symbol of Christianity), the menorah (representing the Jewish faith), and the Ten Commandments, among others, violates the prohibition of the First Amendment.

In considering the circumstances involved in each particular display, the courts have recognized that nearly every such object, while possessing a religious significance, also can portray an event of historical significance or can convey an idea separate from or in addition to the religious symbolism. Therefore, close attention must be paid to whether the display has the purpose or effect of "endorsing" religion. *Allegheny County v. Greater Pittsburgh ACLU, supra.*

In considering the nature of the message that any particular display conveys, the two-step analysis described by Justice O'Connor in her concurrence in *Lynch* is used, *i.e.*, what message did the government subjectively intend to convey and what message would the reasonable observer attribute to the display. However, if the display would actually convey a religious message to a reasonable observer, the otherwise unexpressed and subjective intent of the government is of little consequence.

Three Supreme Court decisions are demonstrative of the approach that is required to be used here.

A Christmas nativity scene was at issue in *Lynch v. Donnelly, supra.* There, a city had annually erected a holiday display during the Christmas season. The display consisted of many figures and decorations associated with that holiday, including Santa Claus, his reindeer, candy-striped poles, a Christmas tree, carolers, a clown, an elephant, a teddy bear, and lights. Also included was a creche over which a banner read, "Season's Greetings." The majority of the court, which included Justice O'Connor by means of her special concurrence, held that the message communicated by the display, when considered as a whole, was simply a celebration of the holiday season and included a number of figures and symbols generally associated with that holiday. Under these circumstances, the inclusion of a nativity scene, while obviously bearing a religious connotation if considered alone, was also an accepted symbol of the holiday, and as such, its inclusion in the display did not violate the First Amendment.

Consistent with *Lynch*, our supreme court, in *Conrad v. Denver*, 724 P.2d 1309 (Colo. 1986) (*Conrad II*), found no constitutional violation in the Christmas display on the grounds of Denver's city and county building, which, like the display in *Lynch*, included many figures and symbols associated with the holiday season.

The second Supreme Court opinion of significance also considered the propriety of a government's display of a nativity scene. In *Allegheny County v. Greater Pittsburgh ACLU, supra*, a county government had erected a creche upon a principal stairway in its courthouse. While there were other Christmas symbols (such as Christmas trees and boughs), as well as other displays (such as a gallery of art and other cultural exhibits), located in other parts of this courthouse, the Supreme Court emphasized that the creche was physically separate from any other display. It was surrounded by evergreen decorations and a white picket fence, and above the manger scene was a banner saying, "Gloria in Excelsis Deo."

About a block from this county-owned courthouse was a building jointly owned by the county and the City of Pittsburgh. During the time that the creche was on display in the courthouse, there was located outside this other building a large Christmas tree next to which was a large menorah, which is a Jewish symbol associated with the Chanukah holiday occurring near the Christmas season.

The majority of the Supreme Court declared that the nativity scene in the courthouse constituted an "endorsement" of religion by the county and was, thus, violative of the establishment clause, but that the menorah next to the Christmas tree conveyed the secular message of the holiday season.

In distinguishing between these two displays, it was emphasized that there was no secular symbol that was in any way associated, either physically or ideologically, with the nativity scene; nothing was present to detract from the religious message that the creche sent. In contrast, because the meno-

rah was displayed in association with a secular symbol of the holiday season, a Christmas tree, this display, like the display in the park in *Lynch,* sent a primarily secular message, rather than a religious message.

The opinion in *Allegheny County* has been interpreted to mean that, if an admittedly religious symbol is maintained on public property, such maintenance will be considered to be an endorsement of the religious theme of the symbol unless it is displayed in association with other, secular symbols or figures from which an overall secular message can be discerned by the reasonable observer. *See Ellis v. City of La Mesa,* 990 F.2d 1518 (9th Cir.1993) (maintenance of cross on public property, unaccompanied by any secular display, violative of First Amendment); *American Civil Liberties Union v. Wilkinson,* 895 F.2d 1098 (6th Cir.1990) (permanent maintenance of rustic stable on state property, used as nativity scene during Christmas holidays but for other purposes throughout remainder of year, does not constitute endorsement so long as large sign denying endorsement of "any religion or religious doctrine" is also displayed).

Finally, in *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), the court considered the constitutionality of a Kentucky statute requiring that a copy of the Ten Commandments, to be purchased by private contributions, be posted on the wall of each public school classroom. The statute also required that, following the last Commandment, there should appear "in small print" the following disclaimer:

> The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States.

Despite the disclaimer, the Supreme Court declared, on a summary basis, that the posting of the Ten Commandments was prohibited by the First Amendment. In doing so, the Supreme Court first set forth what it considered to be the overriding significance of the Ten Commandments in these words:

> The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a

supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness.... Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day.

Next, it considered the purpose that displaying the Commandments was intended to have:

> If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause.

Finally, it determined that the "avowed" secular purpose for the posting, which was to be set forth in small print, could not avoid the conflict with the First Amendment.

Two of the justices dissented from the majority's substantive conclusions, arguing, as the trial court in *Stone* had found and as the trial court here concluded, that the Ten Commandments have had a significant impact on the secular legal codes of Western civilization. Hence, given this secular history, the dissenters would have held that the Commandments could appropriately be displayed because this secular purpose was emphasized by the statutory disclaimer.

The State here argues that the *Stone* decision must be read as applying only to a schoolroom in which impressionable youngsters constitute a "captive audience" for the message to be sent. However, even if we concede that the location of the posting in *Stone* may have added some element of coercion to the state's message, that element of the case does not detract from the Supreme Court's description of the religious nature of the Ten Commandments.

Further, other courts have not interpreted *Stone* in such a limiting fashion. In *Harvey v. Cobb County,* 811 F.Supp. 669 (N.D.Ga.

1993), for example, the court, applying the *Lemon* test and relying upon *Lynch, Allegheny County,* and *Stone,* declared that a framed panel of the Ten Commandments displayed on the wall of a county courthouse, unaccompanied by any countervailing secular passages or symbols, violated the establishment clause.

It is against this background of Supreme Court jurisprudence, then, that we must apply the three-part *Lemon* test.

The first question to address is whether the State, in permitting the monument to be erected and in maintaining it on public property since that time, intended to fulfill a secular purpose. And, frankly, this record contains little, if any, evidence upon the point. The evidence is that no monument may be erected in this park without state approval. However, there is no evidence as to what criteria must be met to obtain such approval, nor any evidence of the basis for the approval of this specific monument.

Because there is no independent evidence of the state's intent, therefore, no conclusion with respect to the message that the state *intended* to convey can be drawn, except to the extent that the message that the display actually conveys to a reasonable observer might lead to some inference of that intent. However, because it is the content of the message actually conveyed that is determinative of the validity of the display here, in any event, we need not speculate upon the state's unexpressed intent.

In determining the message actually conveyed, we are bound to abide by the Supreme Court's conclusion in *Stone* that the Commandments are "undeniably a religious text." We must then determine whether anything else within the monument or anything otherwise associated with it modifies that religious message so that it becomes, primarily, a secular one. In considering this issue, we accept the unquestioned proposition that the Ten Commandments have been, as the trial court determined, a basis for at least some of the precepts of the common law and our legal system. Hence, the issue we address is not whether these Commandments *could* convey a proper secular message; the issue is whether, given the circumstances under which they are displayed here, they do, *in fact,* convey such a message. We conclude that they do not.

First, while various symbols appear on the monument in addition to the text, nothing on the monument detracts from the essential statement that the Commandments come from God and are to be obeyed for that reason. Indeed, if we assume that a reasonable observer would know the meaning of the symbols, all of them reinforce this religious message. The Star of David, the two Greek letters symbolic of Christ, and the all-seeing eye of God do not reveal to one viewing the monument that the Commandments are a part of our *legal* heritage; they say, rather, that they are a part of the Judeo–Christian *religious* heritage. Likewise, the representations of the two stone tablets with strange writing cannot reasonably be interpreted as representing something other than the original tablets that, according to Judeo–Christian doctrine, Moses received from God.

Nor is the addition of an eagle holding an American flag over the text sufficient to change the message from a religious to a secular one. We agree that the inclusion of these two symbols of the nation could arguably refer to the fact that the moral precepts of the Commandments is one of the foundations for the nation. However, the reasonable observer could just as easily conclude that these national symbols, which stand over the Commandments symbolically as protectors, were intended to convey the idea that the national government endorses the concepts, including the various religious mandates, in the text that follows.

We also conclude, contrary to the State's assertion, that no other monument in the capitol complex serves to interpret the Commandments outside this essential religious context. The monolith in question here is physically isolated from all the other monuments in much the same way that the creche in *Allegheny County* was isolated from the other displays and exhibits inside the same courthouse. Indeed, the displays on the east side of the capitol cannot even be seen from Lincoln Park.

Moreover, there is at present no single theme for the monuments in Lincoln Park—one witness for the State described them as a "helter-skelter" display. To the extent that these other monuments have a dominant theme, it is to recognize and to memorialize all those persons who have served their country in time of war. How this theme is furthered by a memorial containing the Ten Commandments, or how the Commandments' *legal* history is emphasized by these memorials to the nation's veterans, has not been explained by the State.

In short, we conclude that monument conveys an essential religious message that would appear to the reasonable observer to be endorsed and approved by the state because of its contents and its location on the property of the state, which is clearly identified as such. Its existence on such property under the circumstances described, therefore, violates the prohibition against the establishment of religion set forth in the First Amendment and the state constitution.

We recognize that, in reaching this conclusion, we differ from the trial court who heard the witnesses, both lay and expert, who testified in this case. However, except for the expression of opinions with respect to the impression given by the monument, the evidentiary facts are substantially undisputed. Further, the ultimate questions which the *Lemon* test requires the courts to answer are not questions of evidentiary fact; they are, rather, judicial questions to be resolved by the court as matters of law. See *Lynch v. Donnelly* (Justice O'Connor, specially concurring). *Cf. Conrad II, supra* (Justice Lohr, specially concurring).

Generally, if a court determines that an existing display of a religious symbol offends against the First Amendment, an order requiring its immediate removal from public property would be appropriate. However, because it is the manner of its display, and not the symbol itself, that offends, some courts have granted the involved government an opportunity to change the display so that a secular, rather than a religious, message is

sent. See *Harvey v. Cobb County, supra.* See also *Ellis v. City of La Mesa, supra.* This is a matter, therefore, that may be addressed by the trial court on remand.

The judgment of the trial court is reversed, and the cause is remanded to it for the adoption of an appropriate decree consistent with the views set forth in this opinion.

BRIGGS and HODGES *, JJ., concur.