2014 CO 77

**John HICKENLOOPER, in his official capacity as Governor of the State of Colorado, and the State of Colorado, Petitioners,**

**v.**

**FREEDOM FROM RELIGION FOUNDATION, INC.; Mike Smith; David Habecker; Timothy G. Bailey; and Jeff Baysinger, Respondents.**

**Supreme Court Case No. 12SC442**

Supreme Court of Colorado.

November 24, 2014

Attorneys for Petitioners: John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Michael L. Francisco, Assistant Solicitor General, Matthew D. Grove, Assistant Attorney General, Denver, Colorado.

Attorneys for Respondents: Inderwish & Bonifazi, P.C., Daniele W. Bonifazi, John H. Inderwish, Centennial, Colorado, Boardman & Clark LLP, Richard L. Bolton, Madison, Wisconsin.

Attorneys for Amici Curiae The National Day of Prayer Task Force and Colorado Elected Officials and Individuals: Alliance Defending Freedom, Michael J. Norton, Greenwood Village, Colorado.

Attorneys for Amicus Curiae The American Humanist Association: American Humanist Association, Monica Miller, Washing-

ton, DC, Azizpour Donnelly LLC, Katayoun A. Donnelly, Denver, Colorado.

Attorneys for Amici Curiae American Civil Liberties Union, American Civil Liberties Union of Colorado, and Americans United for Separation of Church and State: University of Denver Sturm College of Law, Alan K. Chen, Denver, Colorado, ACLU Foundation of Colorado, Mark Silverstein, Sara Rich, Denver, Colorado.

CHIEF JUSTICE RICE delivered the Opinion of the Court.

¶1 We granted certiorari to determine whether Respondents Freedom from Religion Foundation ("the Foundation") and four of its Colorado members ("the Colorado members") have standing to sue Petitioner Governor John Hickenlooper ("the Governor") in his official capacity for issuing annual honorary proclamations that recognize a "Colorado Day of Prayer."[1] Contrary to the court of appeals, we hold that the use of public funds to cover the incidental overhead costs associated with issuing the honorary proclamations does not, by itself, constitute an injury sufficient to establish taxpayer standing. Furthermore, contrary to the trial

court, we hold that the psychic harm endured by Respondents as a result of media coverage revealing the existence of the honorary proclamations does not, by itself, constitute an injury sufficient to establish individual standing. Accordingly, we reverse the judgment of the court of appeals, see *Freedom from Religion Found. v. Hickenlooper*, 2012 COA 81, ¶61, —— P.3d ——, and remand to the court of appeals with instructions to return the case to the trial court for dismissal.

## I. Facts and Procedural History[2]

¶2 In 1952, Congress passed a resolution establishing a "National Day of Prayer," which was later officially defined as the first Thursday of May, see 36 U.S.C.A. § 119 (1998). Today, most states recognize statewide days of prayer that coincide with the National Day of Prayer.[3] Colorado's governor has issued annual honorary proclamations[4] recognizing a Colorado Day of Prayer since 2004. These honorary proclamations have always been issued in response to requests from the National Day of Prayer Task Force ("the Task Force").[5] In the past, a public event has been held on the steps of the Colorado Capitol to celebrate the Colorado Day of Prayer.[6]

1. Specifically, we granted certiorari to review the following issues:
 1. Whether the court of appeals erred by *sua sponte* determining that [Respondents] had taxpayer standing based on *de minimis* governmental expenditures and despite [Respondents'] failure to plead or demonstrate the existence of taxpayer standing in the district court.
 2. Whether the court of appeals erroneously concluded that the state constitution forbids the governor of Colorado from issuing certain honorary proclamations.
 Because we hold that Respondents do not have standing to sue the Governor, we need not address the second issue, which goes to the merits of Respondents' substantive legal claim.

2. The facts presented in this section are based on the parties' stipulations and facts reported by the trial court and the court of appeals that are not disputed.

3. For example, in 2007, 2008, and 2009, the governors of all fifty states issued honorary proclamations or letters acknowledging days of prayer.

4. Honorary proclamations are official documents issued by the Governor's Office that contain the

Governor's seal and signature but that do not have the force or effect of law. The Governor issues hundreds of honorary proclamations every year to recognize a broad array of events and organizations. Although the Governor's Office occasionally denies a request for an honorary proclamation, the large majority of requests are granted. Once issued, the Governor's Office typically does not promote or publicize the honorary proclamations, nor does it track or restrict their use.

5. The Task Force is a private, nonprofit organization that promotes Judeo–Christian values and requests prayer proclamations from every state governor on an annual basis.

6. In 2007, then-Governor Bill Ritter Jr. attended this public event, where he read aloud the 2007 honorary proclamation and addressed the audience. Ritter's attendance at this event, however, is irrelevant to our analysis for two reasons. First, the only government action that Respondents squarely challenge is successive governors' *issuance* of honorary proclamations from 2004 through 2009, not one governor's *attendance* at a public event celebrating the Colorado Day of Prayer. Second, none of the Respondents at-

¶3 Respondents, who self-identify as "non-believers," sued the Governor in his official capacity, alleging that his predecessors violated the Preference Clause in article II, section 4 of the Colorado Constitution by issuing annual Colorado Day of Prayer honorary proclamations from 2004 through 2009.[7] According to Respondents, these government-issued honorary proclamations—which proclaimed a statewide day of prayer in Colorado and (until 2009) contained explicit biblical references—constituted an unconstitutional endorsement of religion that uniquely harmed Respondents by making them feel like political outsiders. Thus, Respondents asked the trial court to enjoin the Governor and his successors from issuing future Colorado Day of Prayer honorary proclamations and to declare the previously issued honorary proclamations unconstitutional. The Governor filed a Motion for Summary Judgment, and Respondents filed a Cross–Motion for Summary Judgment.

¶4 In its Order on Summary Judgment, the trial court first addressed whether Respondents had standing as Colorado taxpayers to sue the Governor. Explaining that a plaintiff "must at least show some use of taxes generally" to establish taxpayer standing, the trial court concluded that Respondents did not have taxpayer standing because there was "no item in the State budget or any expenditure of tax monies relating to the issuance of the honorary proclamations." The trial court then considered whether Respondents had standing to sue as nonbelievers who were offended by the honorary proclamations as a result of Respondents' unavoidable exposure to extensive media coverage broadcasting the existence of the proclamations to Colorado citizens. Emphasizing that the honorary proclamations made Respondents "feel like political outsiders because they do not believe in the supposed power of prayer," the trial court found that Respondents had alleged an injury sufficient to establish individual standing. Nevertheless, the trial court ultimately concluded that the honorary proclamations did not violate the Preference Clause and granted summary judgment in favor of the Governor.

¶5 Respondents appealed, and the Governor cross-appealed. The court of appeals affirmed the trial court's standing determination on different grounds, holding that Respondents had standing to sue the Governor as Colorado taxpayers.[8] Conducting an independent review of the record, the court of appeals determined that public funds were used to cover the following expenses associated with issuing the Colorado Day of Prayer honorary proclamations:

- the cost of materials and supplies to create paper proclamations for the Task Force and for any person who thereafter requested a copy;
- postal expenses for mailing the proclamations to the Task Force and to any person who thereafter requested a copy;
- space on the computer server that is used to store electronic copies of the proclamations; and
- salaries for members of the Governor's office who, as part of their duties, re-

tended this event (nor any other Colorado Day of Prayer event), and they do not allege that they experienced unique harm as a direct result of Ritter's attendance at the 2007 event.

7. Governor Hickenlooper did not actually issue any of the challenged honorary proclamations; then-Governor Bill Owens issued the 2004–06 honorary proclamations, and then-Governor Ritter issued the 2007–09 honorary proclamations. Because Governor Hickenlooper is being sued in his official capacity as the current Governor of Colorado, we hereafter attribute his predecessors' actions to him. Although the parties agree that the Governor issued a Colorado Day of Prayer honorary proclamation in 2010, the court of appeals did not address this specific proclamation because the parties did not provide a copy of

it in the appellate record. Like the court of appeals, we only consider the proclamations from 2004 through 2009.

8. Because the court of appeals determined that the Colorado members—all of whom resided in Colorado—had standing to sue, it did not separately address whether the Foundation—a nonprofit corporation based in Wisconsin and registered to do business in Colorado—had standing. *See Freedom from Religion Found.*, ¶60 ("We need not further decide whether [the Foundation] has standing because it raises claims that are identical to the [Colorado members'] claims."). The Foundation has not raised a separate basis for standing before this Court, so we consider Respondents' collective standing based only on the Colorado members' standing.

ceived, processed, created, and distributed the proclamations.

*Freedom from Religion Found.*, ¶ 52. Although the court of appeals acknowledged that the exact amount of public funds at issue was "not clear," it nonetheless concluded that the Governor's use of any public funds to issue the honorary proclamations was sufficient to establish taxpayer standing. *See id.* at ¶¶ 56, 61. Reaching the merits of Respondents' substantive legal claim, the court of appeals reversed the trial court's Preference Clause determination and deemed the honorary proclamations unconstitutional. *Id.* at ¶ 142.

¶ 6 The Governor appealed, and we granted certiorari review.

## II. Analysis

### A. Standing in Colorado

¶ 7 We review de novo the court of appeals' determination that Respondents have standing to sue the Governor. *See Barber v. Ritter*, 196 P.3d 238, 245 (Colo. 2008). Standing is a jurisdictional prerequisite that can be raised any time during the proceedings. *See Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004); *Anson v. Trujillo*, 56 P.3d 114, 117 (Colo. App. 2002). Because "standing involves a consideration of whether a plaintiff has asserted a legal basis on which a claim for relief can be predicated," *Bd. of Cnty. Comm'rs v. Bowen/Edwards Assocs.*, 830 P.2d 1045, 1052 (Colo. 1992), the question of standing must be determined prior to a decision on the merits, *see Ainscough*, 90 P.3d at 855. If a court determines that standing does not exist, then it must dismiss the case. *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977).

¶ 8 In *Wimberly*, this Court articulated a two-prong test for determining whether a plaintiff can establish standing to sue. *See id.* at 168, 570 P.2d at 539. This test has become the routine test for assessing standing in Colorado. *Brotman v. E. Lake Creek*

*Ranch, L.L.P.*, 31 P.3d 886, 890 (Colo. 2001) ("Because we have applied the *Wimberly* test in a variety of contexts, it has become our 'general' test for standing."); *see, e.g., Barber*, 196 P.3d at 246–47 (applying the *Wimberly* test to determine whether the plaintiffs had taxpayer standing).[9] To satisfy the *Wimberly* test, a plaintiff must establish that (1) he suffered an *injury in fact*, and (2) his injury was to a *legally protected interest*. *See Wimberly*, 194 Colo. at 168, 570 P.2d at 539.

¶ 9 The first prong, the injury-in-fact requirement, maintains the separation of powers mandated by article III of the Colorado Constitution by preventing courts from invading legislative and executive spheres. Because judicial determination of an issue may result in disapproval of legislative or executive acts, this constitutional basis for standing ensures that judicial "determination may not be had at the suit of any and all members of the public." *Wimberly*, 194 Colo. at 167, 570 P.2d at 538 (quoting *Ex–Cell–O Corp. v. City of Chicago*, 115 F.2d 627, 629 (7th Cir. 1940)); *see also Ainscough*, 90 P.3d at 855–56; *Conrad v. City & Cnty. of Denver*, 656 P.2d 662, 668 (Colo. 1982). The injury-in-fact requirement also finds constitutional roots in article VI, section 1, under which Colorado courts limit their inquiries to the resolution of actual controversies. *Bd. of Dirs., Metro Wastewater Reclamation Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 105 P.3d 653, 655–56 (Colo. 2005); *City of Greenwood Vill. v. Petitioners for the Proposed City of Centennial*, 3 P.3d 427, 436–37 (Colo. 2000). In sum, the injury-in-fact requirement ensures that an actual controversy exists so that the matter is a proper one for judicial resolution. *See Conrad*, 656 P.2d at 668. The requirement ensures a "concrete adverseness" that sharpens the presentation of issues to the court. *City of Greenwood Vill.*, 3 P.3d at 437. Thus, although both tangible injuries (e.g., physical damage) and intangible injuries (e.g., aesthetic deterioration of the environment) can satisfy the

9. In some circumstances we have applied a specialized test for standing in lieu of the *Wimberly* test. *See, e.g., McCroskey v. Gustafson*, 638 P.2d 51, 54–56 (Colo. 1981) (affirming the court of appeals' departure from *Wimberly* and adopting its test for determining whether a taxpayer has derivative standing to bring an action *on behalf of a municipality*). We see no circumstances that would lead us to deviate from *Wimberly* in this instance.

injury-in-fact requirement, "an injury that is overly 'indirect and incidental' to the defendant's action" will not convey standing, nor will the remote possibility of a future injury. *Ainscough*, 90 P.3d at 856; *see also Wimberly*, 194 Colo. at 168, 570 P.2d at 539 (holding that the plaintiffs' "[i]ndirect and incidental pecuniary injury" was insufficient to confer standing).

 ¶ 10 The second prong, the legally-protected-interest requirement, promotes judicial self-restraint. *Conrad*, 656 P.2d at 668. This prudential consideration recognizes "that unnecessary or premature decisions of constitutional questions should be avoided, and that parties actually protected by a statute or constitutional provision are generally best situated to vindicate their own rights." *City of Greenwood Vill.*, 3 P.3d at 437. Claims for relief under the constitution, the common law, a statute, or a rule or regulation satisfy the legally-protected-interest requirement. *Ainscough*, 90 P.3d at 856.

 ¶ 11 Because Respondents' Preference Clause claim—which derives from article II, section 4 of the Colorado Constitution—clearly satisfies the second prong of the *Wimberly* test, our standing determination hinges on whether Respondents have alleged injuries—either as taxpayers or as individual nonbelievers—that satisfy the first prong. Thus, we begin our analysis by considering whether Respondents have suffered an injury as Colorado taxpayers that is sufficient to establish taxpayer standing. We next consider whether Respondents have suffered an injury as nonbelievers that is sufficient to establish individual standing.[10] Because we determine that Respondents lack either form of standing, we dismiss their case without reaching the merits of Respondents' substantive legal claim.

## B. Respondents Lack Taxpayer Standing

 ¶ 12 Unlike the United States Supreme Court's narrow view of taxpayer standing, this Court has consistently permitted broad taxpayer standing. *Compare Ariz. Christian Sch. Tuition Org. v. Winn*, —— U.S. ——, 131 S.Ct. 1436, 1442, 179 L.Ed.2d 523 (2011) (explaining that "[a]bsent special circumstances ... standing cannot be based on a plaintiff's mere status as a taxpayer"), *with Ainscough*, 90 P.3d at 856 (explaining that Colorado law allows for "broad taxpayer standing"). Although we have permitted a broad class of plaintiffs to have taxpayer standing, we have also utilized the injury-in-fact requirement to provide conceptual limits to the doctrine when plaintiffs challenge an allegedly unlawful government action.[11] For example, we have held that allegedly unlawful expenditures or transfers of public funds can constitute injuries sufficient to establish taxpayer standing. *See, e.g., Barber*, 196 P.3d at 247 (determining that plaintiffs had "taxpayer standing to challenge the constitutionality of the *transfers* of money from the special funds to the state's General Fund and the concomitant *expenditure* of that money to defray general governmental expense, rather than to defray the cost of services

10. We use the term individual standing to denote standing that flows from a direct and individualized injury to the plaintiff. Importantly, individual standing is distinct from "taxpayer standing," which flows from an "economic interest in having [the taxpayer's] tax dollars spent in a constitutional manner." *Conrad*, 656 P.2d at 668; *see also Brotman*, 31 P.3d at 892 (holding that the plaintiff lacked taxpayer standing because the defendant's action had "no effect on the [plaintiff] as a taxpayer"); *Nicholl v. E–470 Pub. Highway Auth.*, 896 P.2d 859, 866 (Colo. 1995) (noting that "taxpayers have standing to seek to enjoin an unlawful expenditure of public funds"). So-called "citizen standing," under which a citizen has standing to challenge the "actual form of government" under which he is required to live, is not at issue here. *See, e.g., Colo. State Civil Serv. Emps. Ass'n v. Love*, 167 Colo. 436, 442–44, 448 P.2d 624, 626–27 (1968)

(determining that plaintiffs had standing to challenge a legislative act reorganizing the departments of state government); *Howard v. City of Boulder*, 132 Colo. 401, 403–04, 290 P.2d 237, 238 (1955) (determining that plaintiffs had standing to challenge an initiated charter amendment changing the method of electing Boulder city councilmen from an election at large to an election from geographically created councilmanic districts).

11. We limit our analysis of taxpayer standing here to suits *against* the government, which can trigger *direct* taxpayer standing, as opposed to suits *on behalf of* the government, which can trigger *derivative* taxpayer standing. *See McCroskey*, 638 P.2d at 56 (establishing the doctrine of derivative taxpayer standing).

provided to those charged" (emphasis added)); *Dodge v. Dep't of Soc. Servs.*, 198 Colo. 379, 381–83, 600 P.2d 70, 71–72 (1979) (determining that plaintiffs had taxpayer standing to challenge an *expenditure* of public funds to finance nontherapeutic abortions). To satisfy the injury-in-fact requirement, however, the plaintiff must demonstrate a clear nexus between his status as a taxpayer and the challenged government action. *See Barber*, 196 P.3d at 246 (explaining that an injury that is "overly indirect and incidental" to the challenged government action will not convey taxpayer standing (internal quotation marks omitted)).

¶ 13 We most explicitly articulated this nexus requirement in *Brotman*. In that case, we considered whether an adjacent landowner had taxpayer standing to challenge the State Board of Land Commissioners' decision to sell a parcel of school land to a third-party purchaser. 31 P.3d at 888–89. Emphasizing that "income generated from the Land Board's management of school lands [was] distinct from and in addition to income generated through taxation for schools"—and thus did not affect the amount of tax revenue spent on schools—we concluded that the Land Board's decision to sell the school land had "no effect" on the landowner as a taxpayer. *Id.* at 892. Absent the requisite nexus between the landowner's status as a taxpayer and the challenged sale of land, we determined that the landowner did not have taxpayer standing. *Id.*

¶ 14 Turning to the case at hand, Respondents allege in their complaint that they are Colorado taxpayers. But they do not assert any injury based on an unlawful expenditure of their taxpayer money, nor do they allege that their tax dollars are being used in an unconstitutional manner. Indeed, the trial court expressly found that "[t]here is no item in the State budget" relating to the issuance of the challenged proclamations and concluded that there was "no expenditure of public funds in this case."

¶ 15 Respondents nevertheless argue that they have suffered an injury sufficient to establish taxpayer standing because the Governor used public funds in the course of issuing the allegedly unconstitutional honorary proclamations. Even assuming that the Governor used public funds to pay for the paper, hard-drive space, postage, and personnel necessary to issue one Colorado Day of Prayer proclamation each year, such incidental overhead costs are not sufficiently related to Respondents' financial contributions as taxpayers to establish the requisite nexus for standing.[12] If such costs were sufficient to confer taxpayer standing, any and all members of the public would have standing to challenge literally any government action that required the use of a computer, basic office supplies, or state employee time. Article III of the Colorado Constitution and our precedent do not permit this expansive result. Accordingly, we hold that Respondents have not alleged an injury sufficient to establish taxpayer standing.

### C. Respondents Lack Individual Standing

 ¶ 16 Although we reverse the court of appeals' determination that Respondents have taxpayer standing, our standing inquiry is not limited to the specific basis for standing that the court of appeals considered. *See Moody v. People*, 159 P.3d 611, 616 (Colo. 2007) (recognizing that appellate courts have authority to address standing issues sua sponte if there is a sufficient factual record upon which to resolve the issue). Thus, we next consider whether Respondents have individual standing, the only other viable basis for standing in this case, based on their alleged psychic harm as nonbelievers who were exposed to media coverage of the Colorado Day of Prayer honorary proclamations.

 ¶ 17 Like taxpayer standing, Colorado courts provide for broad individual standing. *See Ainscough*, 90 P.3d at 856 (explaining that Colorado's test for standing "has traditionally been relatively easy to satisfy"). Despite our tradition of conferring individual standing to a broad class of plaintiffs, *id.* at 853, we have refused to permit individual

---

**12.** This case is therefore unlike the facts in *Conrad*, in which the City of Denver formally appropriated funds for the storage and display of a life-sized nativity scene on the steps of its City and County Building as part of the building's Christmas holiday decorations. 656 P.2d at 667.

standing when the alleged injury is indirect and incidental to the defendant's conduct. For example, in *Wimberly* we considered whether the bail-bondsmen plaintiffs had individual standing to sue the Denver District Court for adopting a pretrial release program that allowed criminal defendants to choose among a greater number of bail alternatives. 194 Colo. at 165, 168, 570 P.2d at 537, 539. Emphasizing that the possible injury to the bail bondsmen's business was "indirect and incidental" to the court's adoption of the release program, we concluded that the bail bondsmen did not have standing to sue. *Id.* at 168, 570 P.2d at 539.

¶ 18 Respondents argue that they have suffered an injury as nonbelievers that is sufficient to establish individual standing because they were exposed to unavoidable and extensive media coverage revealing the existence of the honorary proclamations. Specifically, Respondents allege that the challenged proclamations amount to "[e]xhortations to pray" that promote and endorse religion in violation of the state constitution, and that the Governor's designation of a Day of Prayer "create[s] a hostile environment for non-believers" who are "made to feel as if they are political outsiders." Importantly, however, Respondents do not allege that the government coerced them to participate in the Colorado Day of Prayer, nor that they suffered any negative consequences at the hands of the government as a result of their non-participation, nor that the government prevented them from exercising their right to nonbelief. In short, although Respondents allege that the Governor violated the Colorado Constitution, they "fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,* 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

¶ 19 Although we do not question the sincerity of Respondents' feelings, without more, their circuitous exposure to the honorary proclamations and concomitant belief that the proclamations expressed the Governor's preference for religion is simply too indirect and incidental an injury to confer individual standing. To hold otherwise would render the injury-in-fact requirement superfluous, as any person who learned of a government action through the media and felt politically marginalized as a result of that secondhand media exposure would have individual standing to sue the government. Because such a result would stretch our already broad conceptualization of individual standing beyond recognition and thrust the judiciary beyond its article III limits, we hold that Respondents have not alleged an injury sufficient to establish individual standing.

## III. Conclusion

¶ 20 Respondents do not have standing to sue the Governor for issuing annual Colorado Day of Prayer honorary proclamations. First, we hold that the use of public funds to cover the incidental overhead costs associated with issuing the honorary proclamations does not, by itself, constitute an injury sufficient to establish taxpayer standing. Second, we hold that the psychic harm endured by Respondents as a result of media coverage revealing the existence of the honorary proclamations does not, by itself, constitute an injury sufficient to establish individual standing. Accordingly, we reverse the judgment of the court of appeals. Because Respondents' failure to establish standing is fatal to their substantive legal claim, we remand to the court of appeals with instructions to return the case to the trial court for dismissal.

JUSTICE HOOD dissents, and JUSTICE HOBBS joins in the dissent.

JUSTICE HOOD, dissenting.

¶ 21 More than three decades ago, several individuals challenged the City of Denver's use of public funds for a prominent holiday display, including a life-size nativity scene (or crèche), adorning the Denver City and County Building. *See Conrad v. City & Cnty. of Denver,* 656 P.2d 662, 664 (Colo. 1982). Despite finding the economic portion of their injuries "at best indirect and very difficult to

quantify," this court held they had standing to sue. *Id.* at 668. "[T]heir economic interest in having their tax dollars spent in a constitutional manner" and "their intangible interest in a government that does not prefer or support the Christian religion over all others" were sufficient to at least entitle them to be heard. *Id.* In reaching this conclusion, we recognized that "the judicial branch is the most appropriate forum for consideration of the plaintiffs' objections to the crèche, primarily because their religious beliefs may not be representative of the majority of citizens in this community." *Id.* at 668 n. 5.

¶ 22 Today, we take a decidedly different path. By using this case to articulate a minimum "clear nexus between [a litigant's] status as a taxpayer and the challenged government action," maj. op. ¶ 12, we turn a deaf ear to citizens whose concern about religious freedom echoes that of the plaintiffs in the crèche case. By diminishing the significance of the indirect "psychic harm" alleged and concluding that the proclamations are not sufficiently coercive to confer individual standing, we confuse the issue of when an individual's claim should be heard with when it should prevail. By rejecting both taxpayer and individual standing, we abdicate our responsibility to consider a matter of great public importance—a matter where Colorado citizens allege that the State's executive branch has violated an individual constitutional right that goes to the core of who we are as a people. Ultimately, I am unpersuaded by the plaintiffs' Preference Clause claim because it is simply not viable under the federal Establishment Clause jurisprudence that has long guided our construction of Colorado's Preference Clause. Nonetheless, I believe we should reach the merits of the plaintiffs' claim. Therefore, I respectfully dissent.

## I. Standing Analysis

¶ 23 I reject the majority's standing analysis for several reasons. First, it departs from Colorado's long-standing and broad precedent regarding when we will hear cases; this undermines the ability of taxpayers to enforce governmental compliance with the state constitution. Second, it is implicitly premised on the notion that expansive taxpayer standing invites an onslaught of litigation by "any and all members of the public," a barrage destined to undermine our separation of powers; if that were true, our tripartite government probably should have unraveled long ago. It hasn't. Third, the majority relies on plainly distinguishable precedent in seeking to limit the scope of taxpayer standing. Fourth, even if some restriction on taxpayer standing is justified, the plaintiffs have established individual standing. The intangible injuries they allege, flowing from the nature of the right at issue, provide the most compelling basis for standing in this case.

¶ 24 As the majority acknowledges, Colorado plaintiffs "benefit from a relatively broad definition of standing." *Ainscough v. Owens,* 90 P.3d 851, 855 (Colo. 2004). A plaintiff need only demonstrate some (1) injury in fact (2) to a legally protected interest. *See Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977). "To constitute an injury-in-fact, the alleged injury may be tangible, such as physical damage or economic harm, or intangible, such as aesthetic harm or the deprivation of civil liberties." *Barber v. Ritter,* 196 P.3d 238, 245–46 (Colo. 2008); *see also Ainscough,* 90 P.3d at 856 (collecting cases). Likewise, the legally protected interest may be something as abstract as free speech or expression. *Barber,* 196 P.3d at 246 & n. 9 (citing *Conrad,* 656 P.2d at 668). This test "has traditionally been relatively easy to satisfy." *Ainscough,* 90 P.3d at 856.

¶ 25 In *Conrad,* for example, we found standing based on the relatively modest taxpayer funds spent to maintain and store the crèche. 656 P.2d at 668 & n. 5. The majority attempts to distinguish those relatively small costs from the "incidental overhead costs" at issue here. *See* maj. op. ¶ 15. Based simply on the math, that distinction is tenuous. Perhaps that explains why the majority instead chooses to drop a footnote that tries to distinguish *Conrad* based on the existence of a formal appropriation. *See id.* ¶ 15 n.12. But this distinction strikes me as artificial. If the government spends public funds unconstitutionally, does it really matter

whether it officially appropriated them for misuse beforehand? Besides, this court found taxpayer standing to challenge the use of public funds to finance nontherapeutic abortions in *Dodge v. Department of Social Services*, 198 Colo. 379, 380, 600 P.2d 70, 70–71 (1979), even though the legislature did not earmark the funds for that specific purpose. *Accord id.* at 383, 600 P.2d at 72 (Dubofsky, J., concurring).

¶ 26 Regardless, the broader implications are troublesome.

¶ 27 Today, we drastically reduce the opportunity for Colorado citizens to be heard on the scope of a fundamental right. By declaring that the "incidental overhead costs" the Governor incurred in issuing the prayer-day proclamations are insufficient to confer taxpayer standing, maj. op. ¶ 15, the majority violates the well-established principle that "injury in fact may be found in the absence of direct economic injury," *Dodge*, 198 Colo. at 381, 600 P.2d at 71. After all, "even where no direct economic harm is implicated, a citizen has standing to pursue his or her interest in ensuring that governmental units conform to the state constitution." *Nicholl v. E-470 Pub. Highway Auth.*, 896 P.2d 859, 866 (Colo. 1995). Now some governmental acts will be immune from judicial review simply based on the dollars and cents involved—even if those acts violate the Colorado Constitution.

¶ 28 The majority cautions that finding taxpayer standing in this case would subject the government to unmanageable litigation over any official act. It warns us that if the minimal costs at issue here "were sufficient to confer taxpayer standing, any and all members of the public would have standing to challenge literally any government action that required the use of a computer, basic office supplies, or state employee time." *See* maj. op. ¶ 15. But this seems alarmist, considering that this court has applied standing principles broadly for decades without calamity.

¶ 29 The majority worries that finding taxpayer standing here creates a recipe for improper encroachment on the legislative and executive branches of our government. *See* maj. op. ¶¶ 9, 15. Such vigilance is appropri-

ate. As we explained in *Conrad*, however, the injury-in-fact requirement "assure[s] that an actual controversy exists so that the matter is a proper one for judicial resolution." 656 P.2d at 668. And when that requirement is satisfied, as I believe it is here, the judicial branch must give audience because it "is the most appropriate forum for consideration of the plaintiffs' objections" to a practice that potentially shows a preference for one set of religious beliefs over another. *Id.* at 668 n. 5.

¶ 30 In its effort to stem what it apparently perceives as a coming tide of complaints jeopardizing the separation of powers, the majority articulates a "clear nexus" requirement. Maj. op. ¶ 12. A plaintiff must demonstrate a "clear nexus between his status as a taxpayer and the challenged government action." *Id.* In support of this proposition, the majority cites *Barber v. Ritter*, 196 P.3d at 246, and *Brotman v. East Lake Creek Ranch, L.L.P.*, 31 P.3d 886, 892 (Colo. 2001). *See* maj. op. ¶¶ 12–13. Granted, both cases state (albeit without any elaboration) that taxpayer standing does not exist when an injury is "overly indirect and incidental to" the challenged government action. But this court did not examine standing in terms of any monetary minimum in *Barber*. To the contrary, we recognized the long history of "broad taxpayer standing in the trial and appellate courts." *Barber*, 196 P.3d at 246 (quoting *Ainscough*, 90 P.3d at 856). And *Brotman* did not involve any expenditure of taxpayer funds; rather, it addressed a transfer of school lands that might have resulted in less income generated from the management of those lands. 31 P.3d at 891–92. Thus, the governmental action at issue in *Brotman* had "no effect" on the taxpayer, *id.* at 892, not the de minimis effect the majority sees here. In other words, *Brotman* simply required *some* discernible nexus involving *some* expenditure of funds, not the indeterminate, and no doubt soon-to-be-shifting, "*clear* nexus" the majority establishes today.

¶ 31 The right to religious freedom must contemplate the opportunity to press for its enforcement, even at the margins when the pecuniary interest is small. Otherwise, we risk erosion of the core right. A fundamen-

tal "precept of constitutional law is that a self-executing constitutional provision ipso facto affords the means of protecting the right given and enforcing the duty imposed." *Ainscough*, 90 P.3d at 856 (citation omitted). The taxpayer has long provided this protection and enforcement. Indeed, "[i]f a taxpayer and citizen of the community be denied the right to bring such an action ... , then the wrong must go unchallenged, and the citizen and taxpayer reduced to mere spectator without redress." *Howard v. City of Boulder*, 132 Colo. 401, 404, 290 P.2d 237, 238 (Colo. 1955).

¶ 32 But rather than engage in the challenging, if not impossible, task of making distinctions based on modest expenditures of taxpayer resources (and risk stretching taxpayer standing further than we should), it makes much more sense to simply focus on individual standing based on the intangible injuries that are motivating this lawsuit. *See Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (stating that an injury "often turns on the nature and source of the claim asserted").

¶ 33 After all, no one can seriously argue that these Preference Clause plaintiffs are roused by the prospect of an infinitesimal reduction in their tax burdens. Instead, they are motivated by their feelings of government-sponsored religious exclusion. In essence, they agree with Justice O'Connor that a government endorsing religion "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *See Lynch v. Donnelly*, 465 U.S. 668, 688, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). The plaintiffs allege that the Governor's prayer proclamations created a "hostile environment" for them as non-believers, made them feel like "political outsiders," exposed them to "unwanted proclamations of prayer and public celebrations of religion," subjected them to "official admonitions" about the power of prayer, and exhorted them to pray. These "psychic harms" are precisely the sort of injuries that the Preference Clause is designed to guard against.

¶ 34 And, however ephemeral these psychic harms may be, no one argues that they fail to emanate from an actual controversy as required by article VI, section 1 of the Colorado Constitution. If the litigation culminating in our decision today proves nothing else, it proves that largely intangible injuries can provide the "concrete adverseness which sharpens the presentation of issues that parties argue to the courts." *See City of Greenwood Vill. v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 437 (Colo. 2000) (internal quotation marks omitted).

¶ 35 *Conrad* provides another example of this concrete adverseness in a case in which we found standing premised in part on the "intangible interest in a government that does not prefer or support the Christian religion over all others." 656 P.2d at 668. That intangible injury sufficed despite the Supreme Court's admonition that "generalized grievance[s]" do not qualify. *Id.* at 669 (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 483–85, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

¶ 36 The majority nonetheless discounts these intangible injuries as too "indirect" to justify standing because the plaintiffs learned of the proclamations through the media. Their contact was "secondhand," their exposure "circuitous." *See* maj. op. ¶ 19. Yet, proclamations, by their very nature, are almost always experienced in this fashion. Setting aside former Governor Ritter's public reading (which the plaintiffs did not attend), no member of the public could have known about these proclamations absent media coverage. The proclamations were never distributed, or displayed in public, or memorialized in any way—except as a news item. Proclamations have no concrete manifestation. They are not signs, seals, or symbols. You cannot pass by these proclamations on your way to work. You will not find them erected in a public park or carved on a courthouse entrance. If this direct/indirect distinction were dispositive, as the majority suggests, then no one would ever have standing to challenge *any* prayer proclamation that he or she did not physically attend, even

if that proclamation clearly violated the Preference Clause.

¶ 37 In this context, I see no difference between unwelcome direct contact through media exposure and unwelcome direct contact with a cross, crèche, sign, seal, or symbol through in-person exposure. That a proclamation is "announced rather than displayed does not preclude unwelcome direct contact." *Ariz. Civil Liberties Union v. Dunham,* 112 F.Supp.2d 927, 933 (D. Ariz. 2000) (reasoning that a reported proclamation can be "more invasive than a visual display" given the pervasiveness of modern media coverage).

¶ 38 What the majority must mean then is that the plaintiffs' intangible injuries are simply not substantial enough. *See* maj. op. ¶ 19. One gleans that much from what the majority finds "important": the government never forced the plaintiffs to pray, or punished them for refusing to do so, or prohibited them from exercising their right not to do so. *Id.* ¶ 18. True enough. Injuries that flagrant are obviously sufficient to confer standing, but we have never closed the courthouse door to those alleging less egregious violations.

¶ 39 By closing that door today, the majority conflates standing with the plaintiffs' likelihood of success on the merits. In effect, the majority prohibits the plaintiffs from bringing a Preference Clause claim because they failed to prove a violation in their complaint. Yet, in *Conrad* we underscored the need to at least consider claims in this context, even if they ultimately fail. 656 P.2d at 668 ("Our holding that the prudential requirement of the standing rule has been satisfied is based on the plaintiffs' allegations and is not equivalent to a holding on the merits of the plaintiffs' claim that the governmental action in this case shows actual preference or support for a particular religion within the meaning of this constitutional provision.").

¶ 40 I would hold, in accordance with Colorado's long-standing, broad application of standing principles, that the plaintiffs' allegations of intangible injury in this context are sufficient to confer standing. Their claim should be decided on the merits.

## II. Merits Analysis

¶ 41 Unlike our approach to standing, we have traditionally approached Preference Clause cases by looking to the federal Establishment Clause and the case law construing it. Because the Supreme Court now uses coercion as the touchstone for cases not involving physical religious symbols, I believe that we should focus on whether there is coercion here. Because there is none, the plaintiffs' claim fails, but it fails on the merits.

¶ 42 Each proclamation at issue here [1] references five things: (1) the Declaration of Independence and its notion "[t]hat all men are created equal, that they are endowed by their Creator with certain unalienable Rights," including life, liberty, and the pursuit of happiness; [2] (2) the National Day of Prayer, established in 1952 and "defined by President Ronald Reagan as the first Thursday in May," which "provides Americans with the chance to congregate in celebration of these endowed rights"; (3) citizens' freedom to gather, worship, and pray, both in public and in private; (4) a Judeo–Christian biblical passage, such as Psalm 28:7, "The Lord is my strength and shield, my heart trusts in Him, and I am helped"; [3] and (5) an acknowl-

1. Although the complaint focuses only on the 2007 and 2008 proclamations, the record contains—and the court of appeals addresses—proclamations from 2004 to 2009. The proclamations from 2004 through 2006 were issued by former Governor Bill Owens; the proclamations from 2007 through 2009 were issued by former Governor Bill Ritter, Jr.

2. The format of the 2004 proclamation is slightly different. Instead of referring to the Declaration of Independence, it states that our forefathers founded this country as "One Nation Under God" because they "recogniz[ed] the need for spiritual guidance."

3. The 2004 proclamation "acknowledges Leviticus 15:10" and the yearly theme for the national day of prayer, "Let Freedom Ring." The 2005 to 2008 proclamations actually quote biblical passages that relate to the yearly theme. In 2005, the passage quoted is Hebrews 4:16 ("Let us then approach the throne of grace with confidence, so that we may receive mercy and find grace to help us in our time of need") and the theme, "God Shed His Grace on Thee." In 2006, the passage

edgement that on the day of the proclamation some "individuals across this state and nation will unite in prayer for our country, our state, our leaders, and our people."

¶ 43 The Preference Clause prohibits the government from favoring one religion over another or religiosity over secularism. *State v. Freedom From Religion Found.*, 898 P.2d 1013, 1019 (Colo. 1995) (*"Freedom "*).[4]

¶ 44 In evaluating the scope of the Preference Clause, we have consistently looked to the federal Establishment Clause and the case law construing it. *Id.* In light of that case law, we have upheld the constitutionality of the crèche displayed at Denver's City and County Building, *see Conrad v. City & Cnty. of Denver*, 724 P.2d 1309, 1317 (Colo. 1986) (*"Conrad II"*), as well as a Ten Commandments monument displayed in Denver's Lincoln Park, *see Freedom*, 898 P.2d at 1026–27.

¶ 45 In *Conrad II*, we applied the Supreme Court's three-part test from *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). It asks: (1) whether a law has a secular purpose; (2) whether its principal or primary effect either advances or inhibits religion; and (3) whether it fosters an excessive entanglement with religion. *Id.* at 612–13, 91 S.Ct. 2105. In *Freedom*, we applied a "refined" version of *Lemon* that asks "whether the suspect government act has 'the purpose or effect of "endorsing" religion.' " 898 P.2d at 1021 (quoting *Allegheny Cnty. v. ACLU*, 492 U.S. 573, 592, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)).

¶ 46 Despite *Lemon*'s ubiquity, our decision to apply it in both cases was calculated and not preordained. We applied *Lemon* in

*Conrad II* because it was "well-suited to an analysis of nativity scenes appearing as part of a larger holiday display." *Conrad II*, 724 P.2d at 1314. And in *Freedom*, we applied *Lemon's* "refined" test because it "provide[d] a sound analytical framework for evaluating governmental use of religious symbols." *Freedom*, 898 P.2d at 1021 (quoting *Allegheny Cnty.*, 492 U.S. at 592, 109 S.Ct. 3086) (internal quotation marks omitted).

¶ 47 Because a proclamation is not a "religious symbol," I question whether *Lemon* is "well-suited" to evaluating its constitutionality, especially given our observation, in both cases, that the Supreme Court has chosen not to apply *Lemon* in cases involving the constitutionality of public prayers. *See Conrad II*, 724 P.2d at 1314 n. 6 (citing *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983)); *Freedom*, 898 P.2d at 1021 n. 8 (citing *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)). In my view, *Marsh* and *Lee* provide a better framework to assess the proclamations in light of the Supreme Court's steady trend towards coercion-based Establishment Clause jurisprudence.

¶ 48 *Marsh* upheld the constitutionality of the Nebraska legislature's practice of opening each of its sessions with a prayer. 463 U.S. at 792, 103 S.Ct. 3330. The State makes much of *Marsh*, intimating that it justifies upholding enduring historical practices, even if they are of questionable constitutionality: "It makes no sense to cast aside as irrelevant the openly exhortative content of the historic prayer proclamations in Colorado while then declaring unconstitutional the more mild content of the modern honor-

is 1 Samuel 2:30 ("Those who honor me, I will honor") and the theme, "America, Honor God." In 2007, the passage is 2 Chronicles 7:14 ("If my people, who are called by my name, will humble themselves and pray and seek my face and turn from their wicked ways, then will I hear from heaven and will forgive their sin and will heal their land"), with no theme listed. In 2008, the passage is Psalm 28:7, as set forth in the body of this dissent. The 2009 proclamation does not reference or quote the Bible.

**4.** The relevant portion of the Colorado Constitution states: **"Religious freedom.** The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever

hereafter be guaranteed; and no person shall be denied any civil or political right, privilege or capacity, on account of his opinions concerning religion; but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, excuse acts of licentiousness or justify practices inconsistent with the good order, peace or safety of this state. No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent. *Nor shall any preference be given by law to any religious denomination or mode of worship."* Colo. Const. art. II, § 4 (emphasis added). The last sentence is generally referred to as "the Preference Clause."

ary proclamations." But even if the "history and tradition of our Nation are replete with public ceremonies featuring prayers of thanksgiving and petition," *Lee*, 505 U.S. at 633, 112 S.Ct. 2649 (Scalia, J., dissenting), as the State claims, "*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation," *Town of Greece v. Galloway*, —— U.S. ——, 134 S.Ct. 1811, 1819, 188 L.Ed.2d 835 (2014).

¶ 49 So how are we to understand *Marsh*, if not for its historical foundation? Although the Court focused much of its analytical energy on the historical analysis, the absence of coercion played a deciding role in its decision to allow opening prayers. The Court reasoned that the prayers were not "proselytizing" and that the people claiming injury—mature adults—were "not readily susceptible to religious indoctrination or peer pressure." *Marsh*, 463 U.S. at 792, 103 S.Ct. 3330 (internal citations and quotation marks omitted). In other words, the absence of coercion—either in the content of the prayers or the context in which they were given—supported the Court's holding.

¶ 50 That coercion analysis, perhaps only an undercurrent in *Marsh*, was the Court's overarching concern in *Lee*. Finding prayers before public school graduation ceremonies unconstitutional, the Court focused on the "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee*, 505 U.S. at 580, 112 S.Ct. 2649. That coercion included "peer pressure" to conform (especially pronounced in "susceptible" adolescents) and the graduation ceremonies' compulsory nature ("voluntary" in only the most formalistic sense). *Id.* at 593–95, 112 S.Ct. 2649; *see also Freedom*, 898 P.2d at 1023 ("School religion cases require a more stringent analysis because of the age of the minds affected, and because students are captive audiences, especially susceptible to influence."). The Court then distinguished *Marsh* as involving "adults [who] are free to enter and leave" the legislative sessions "with little comment and for any number of reasons." *Lee*, 505 U.S. at 597, 112 S.Ct. 2649. As discussed above, the

"*Marsh* majority in fact gave specific recognition to this distinction and placed particular reliance on it." *Id.*

¶ 51 From those cases, I glean two broad principles. First, the United States Supreme Court does not appear to apply *Lemon* to cases involving public prayer, perhaps because that test is simply not "well-suited" to them. *See Conrad II*, 724 P.2d at 1314. Second, *Marsh* and *Lee* turn on the presence or absence of coercion. That inquiry, in turn, seems to depend on two factors: the nature of the intended audience (whether it is composed of adults, as in *Marsh*, or "susceptible" adolescents, as in *Lee*); and the nature of attendance (whether it is voluntary, as in *Marsh*, or compulsory, as in *Lee*).

¶ 52 I recognize that the Supreme Court's Establishment Clause jurisprudence has not been a model of consistency, and any attempt to glean consistency from its cases—or draw any categorical conclusions—is an exercise fraught with peril. But it seems plain that the Court has been trending away from *Lemon*, which Justice Scalia saw fit to liken to a "ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring).

¶ 53 And the Court's recent decision in *Town of Greece* continues that trend. Relying on *Marsh*, the Court upheld Greece's practice of opening monthly board meetings with a prayer. *Town of Greece*, 134 S.Ct. at 1828. Although the Court referenced the significance of long-standing historical traditions, the Court's analysis emphasized the absence of coercion when considering the setting and the audience. *See id.* at 1825. A plurality of the Court—Justice Kennedy, joined by Chief Justice Roberts and Justice Alito—noted that if nonbelieving "mature adults" found the prayers distasteful, they could leave and "their absence [would] not stand out as disrespectful or even noteworthy." *Id.* at 1825–27 (concluding there is no impermissible coercion by exposing constituents to prayer they would rather not hear and in which they need not participate).

Justice Thomas, joined by Justice Scalia, concluded that "actual legal coercion" through force of law and threat of penalty is the standard but also noted that the majority properly concluded that offense does not equate to coercion. *Id.* at 1838 (Thomas, J., concurring in part and concurring in the judgment). Not a single justice used the *Lemon* "endorsement" test.

¶ 54 As I read it, *Town of Greece* continues the Court's jurisprudential migration—at least in the public prayer context—towards a framework under which coercion is the benchmark. *See Elmbrook Sch. Dist. v. Doe*, — U.S. ——, 134 S.Ct. 2283, 2284, 189 L.Ed.2d 795 (2014) (Scalia, J., dissenting from denial of certiorari) ("*Town of Greece* abandoned the antiquated 'endorsement test,'" and it "made categorically clear that 'mere offense ... does not equate to coercion' in any manner relevant to the proper Establishment Clause analysis."). Indeed, it is unclear whether *Lemon* has any continued vitality at all outside of government funding for the physical display of religious symbols.

¶ 55 Following the Supreme Court's lead, I would evaluate the proclamations using the coercion framework and conclude that these proclamations do not run afoul of the Preference Clause. These proclamations are not directed at "susceptible" adolescents. Indeed, they are not directed at anyone. They are, as the name suggests, proclaimed, announced, or issued. There is no captive audience. These proclamations are not read before legislative sessions. No one is subjected to them during unrelated ceremonies, such as a high school graduation. By proclaiming a "Colorado Day of Prayer," the Governor never "directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that [his] decisions might be influenced by a person's acquiescence in the prayer opportunity." *Town of Greece*, 134 S.Ct. at 1826. The plaintiffs take offense and feel excluded by these proclamations, but under *Town of Greece*, offense is not coercion. Exposing constituents to prayer they would rather not hear (or read) does not compel worship. Although sufficient to confer standing (notwithstanding maj. op. ¶ 19), the plaintiffs' alleged injuries are nevertheless insufficient to establish a Preference Clause violation under the Supreme Court's coercion framework.

¶ 56 Each proclamation states, "WHEREAS, on [the date of the proclamation], individuals across this state and nation will unite in prayer for our country, our state, our leaders and our people." The plaintiffs claim this component constitutes an exhortation to pray, rather than simply an acknowledgement that some people will pray. But the use of the word "whereas" suggests to me that the Governor is simply recognizing that many people of faith will engage in prayer when invited to do so, not that he is beseeching individuals to pray or engage in a mode of worship.

¶ 57 Finally, I am mindful of our role here. To be sure, we are duty-bound to evaluate the constitutionality of government action, including the Governor's issuing prayer proclamations. But those proclamations, unlike universally applicable legislative enactments, are more akin to speech than law.[5] Evaluating that speech would thrust this court into an uncomfortable role: that of parsing and potentially censoring the Governor's speech for religious content. While the constitutional balance of our governmental system may give us the power to do so, the separation-of-powers concern certainly counsels caution.

¶ 58 If our "tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith," then it must also be assumed that adult citizens can tolerate something far less intrusive: a proclamation urging appreciation of the power of a prayer. *See Town of Greece*, 134 S.Ct. at 1823. Like the majority, I "do not question the sincerity of [the plain-

---

5. Governor Hickenlooper's current website describes proclamations as "non-binding documents signed by the Governor of Colorado in recognition of special events or significant issues." Colorado, The Official State Web Portal, Gov. John Hickenlooper, http://www.colorado. gov/govhdir/requests/proclamation.html (last visited Nov. 21, 2014). It also notes that "[p]roclamations neither indicate nor imply Governor Hickenlooper's support of any given issue, project or event." *Id.*

tiffs'] feelings." Maj. op. ¶ 19. But adults "often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views." *Town of Greece*, 134 S.Ct. at 1823. Rather, "part of learning how to live in a pluralistic society" is learning how to "endure" contrary ideas and to counter them based on one's own perspective. *Lee*, 505 U.S. at 590, 112 S.Ct. 2649.

¶ 59 I would hold that the plaintiffs have failed to establish a Preference Clause violation and would reverse the judgment of the court of appeals holding otherwise.

I am authorized to state that JUSTICE HOBBS joins in the dissent.